UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOHN J. SPERZEL III,

     Plaintiff,

          v.

CHEMBIO DIAGNOSTICS, INC.,

     Defendant.

Case No.

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, John J. Sperzel III ("Sperzel"), by and through his undersigned counsel, alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action against Chembio Diagnostics, Inc. ("Chembio" or the "Company") based upon its unlawful refusal to allow Sperzel to exercise his stock options in the Company, consistent with and pursuant to the applicable plans underlying the grants and the parties' agreements.

2. Chembio is a public company that develops point-of-care diagnostic tests for infectious diseases. Sperzel is the former Chief Executive Officer of Chembio.

3. Under the terms of his employment agreement with the Company, Sperzel was entitled to a clearly defined severance package if he and the Company failed to enter into a new employment agreement before the current agreement expired, in March 2020.

4. The Company's offer to Sperzel for a renewal contract was grossly inadequate to properly compensate him compared to his peers, according to a thorough compensation analysis completed by a leading executive compensation firm hired by Chembio. As such, at the end of

2019, Sperzel approached Katherine Davis, the Chair of Chembio's Board of Directors, and indicated that, although he could stay with Chembio until March 2020 and receive the full severance benefits under his employment agreement, he was amenable to negotiating an earlier, amicable departure from Chembio.

5.      Thereafter, the parties negotiated and agreed upon the terms of Sperzel's departure. The separation agreement between Sperzel and Chembio requires that Sperzel consults with the Company and others on Chembio matters for a 90-day period after the end of his employment. The separation agreement also requires Sperzel to make himself available and assist the Company with litigation matters, at Chembio's request, and requires Chembio to compensate Sperzel at the rate of $218.75 per hour, as an independent contractor, in exchange for his services.

6.      Sperzel's employment with Chembio ended on January 3, 2020.  Consistent with his separation agreement with Chembio, Sperzel continued to provide services to the Company after the end of his employment, including exchanging considerable communications with Board members, executives, employees, shareholders and others about the Company's operations and the strategy for moving forward.

7.      Consistent with the separation agreement, in the fall of 2020, Sperzel provided services to Chembio and its outside counsel, K&L Gates LLP, in connection with an arbitration matter. Sperzel has continued to provide services in 2021, at the request of Chembio, through its counsel, relating to the ongoing arbitration matter.

8.      Under the terms of the applicable stock incentive plans, Sperzel has a period of 30 days after the date that he ceased qualifying as an "Eligible Person" in which to exercise his options.  Under the operative agreements, an "Eligible Person" includes "persons who provide

services to the Company."  By virtue of his continued services to Chembio after his separation from the Company, Sperzel remained, and still remains, an "Eligible Person."

9.      Chembio's Chief Financial Officer and the Company's outside corporate counsel at the law firm of K&L Gates both communicated to Sperzel that he was restricted from exercising his options until after the Company filed its Form 10-K for 2019, which it did on March 13, 2020.

10.     Despite the clear language in the 2008 and 2014 Plans and Separation Agreement (as such terms are defined below), when Sperzel attempted to exercise his options, Chembio stated that the Compensation Committee of the Company's Board of Directors (the "Committee") had determined that Sperzel's options expired on February 3, 2020, and refused to allow him to exercise his options.

11.     Additionally, Sperzel has presented two invoices to Chembio in connection with the arbitration-related services he provided to the Company in the fall of 2020.  Chembio has failed to pay either invoice, in violation of the Separation Agreement.

12.     Sperzel brings this lawsuit to ensure that he gets the full benefit of the bargain he struck with Chembio, including the fair market value of his vested options which Chembio unlawfully and unscrupulously refused to allow him to exercise. Sperzel also seeks a declaration that, as a result of Chembio's breaches, Sperzel is relieved from any further performance under the Separation Agreement.

## II.  THE PARTIES

13.     Plaintiff Sperzel is a common shareholder and former Chief Executive Officer of Chembio.  He is a resident of Attleboro, Bristol County, Massachusetts.

- 3 -

14.     Defendant Chembio is a Nevada corporation with headquarters located at 555 Wireless Blvd, Hauppauge, Suffolk County, New York.  Chembio's common stock is publicly traded on the NASDAQ stock exchange (NASDAQ: CEMI).  The Company produces point-of-care diagnostics for infectious diseases in humans and animals, which provide results in approximately 20 minutes.

### III.  JURISDICTION AND VENUE

15.     This amount in controversy in this civil action exceeds the sum or value of $75,000, exclusive of interest and costs.  This civil action is between citizens of different states, *to wit*, there is complete diversity of citizenship among plaintiff Sperzel and the Company.  This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a).

16.     This court has personal jurisdiction over Chembio because Chembio's principal executive offices are located in this district.  Venue is proper in this judicial district under 28 U.S.C. § 1391 because the Company conducts substantial business in this district and a substantial portion of the Company's actions underlying this action occurred in this district.

### IV.  FACTUAL BACKGROUND

## I.    Chembio Diagnostics, Inc.

17.     The company now known as Chembio was originally incorporated in 1999 under the name of Trading Solutions.com, Inc. ("TSI"), with a principal office in Monterey, California.  TSI was initially established as an online trading school, designed to provide education for people interested in online investing.

18.     That business and several other business attempts, including a brief attempt to develop and market soft drinks, failed.  By September 30, 2003, TSI had no revenues or business

operations, and its balance sheet reflected a total asset value of $0.00. The Company was actively seeking a merger or acquisition partner.

19.     In December 2003, the majority shareholder of TSI sold his controlling interest to another individual. That transaction effectuated a change in control of TSI. TSI eventually merged with Chembio Diagnostics, Inc.

## II.   **Chembio Hires Sperzel**

20.   In December 2013, Sperzel was contacted by an executive search firm, which had been retained by the Chembio Board of Directors to identify a new President and Chief Executive Officer.

21.   Sperzel came to Chembio with extensive leadership experience in the point-of-care diagnostics industry. Prior to joining Chembio, Sperzel was the President and CEO of International Technidyne Corporation. Sperzel previously served as President at Axis-Shield and has also held Vice-President level positions at Bayer Diagnostics, Instrumentation Laboratory, and Boehringer Mannheim Diagnostics.

22.     Effective March 13, 2014, Chembio hired Sperzel as its President and Chief Executive Officer. On March 17, 2014, Sperzel was also elected to Chembio's Board of Directors.

23.     The initial terms of Sperzel's hire by Chembio were set forth in an employment agreement with the Company, effective as of March 13, 2014 (the "2014 Employment Agreement"). As set forth in the 2014 Employment Agreement, in connection with his hire, Sperzel was granted an option to purchase up to 250,000 shares of the Company's common stock, 43,132 of which were incentive stock options granted under the Company's 2008 Stock Incentive Plan (the "2008 Plan"), and the remainder of which (206,868 shares) were to be non-

qualified stock options.  A true and accurate copy of the 2008 Plan is attached hereto at **Exhibit A**.

24.     The grant of 250,000 shares is set forth in seven separate stock option agreements as follows, each setting forth a grant date of March 13, 2014:

      a.    One stock option agreement for 25,000 incentive stock options (the "25,000 ISO Agreement");

      b.    A second stock option agreement for 18,132 incentive stock options (the "18,132 ISO Agreement");

      c.    A stock option agreement for 25,000 non-incentive stock options (the "25,000 NISO Agreement");

      d.    A stock option agreement for 31,868 non-incentive stock options (the "31,868 NISO Agreement");

      e.    Three stock option agreements each for 50,000 non-incentive stock options, but with vesting dates in 2017, 2018 and 2019, respectively (the "2017 NISO Agreement," "2018 NISO Agreement" and "2019 NISO Agreement," respectively).

A true and accurate copy of the 25,000 ISO Agreement, 18,132 ISO Agreement, 25,000 NISO Agreement, 31,868 NISO Agreement, 2017 NISO Agreement, 2018 NISO Agreement and 2019 NISO Agreement are attached hereto at **Exhibits B**, **C**, **D**, **E**, **F**, **G**, and **H**, respectively. The seven stock option agreements representing the 250,000 options are hereinafter referred to as the "2014 Stock Option Agreements").

25.     Each one of the 2014 Stock Option Agreements states that the options granted thereunder are issued pursuant to the 2008 Plan.

26.     Each of the 2014 Stock Option Agreements provides that any option vested thereunder may be exercised "for thirty days after Optionee ceases to be an Eligible Person" (except in the case of his death or disability), and no later than the Term/Expiration Date underlying each grant.

27.     The 2008 Plan defines an "Eligible Person" as "Officers and Employees and other persons **who provide services to the Company** or any Related Company, including directors of the Company or any Related Company" (emphasis added).

28.     The Merriam-Webster dictionary defines "services," in relevant part, as: (i) the work performed by one that "serves" (in turn defining the verb "to serve" as "to be of use"); and/or (ii) the act of serving, such as useful labor that does not produce a tangible commodity.

29.     The 2014 Employee Agreement was in effect for a three-year term, which was set to expire on March 13, 2017.  Although Sperzel reached out to the Compensation Committee of the Board on several occasions, before the end of the term, to negotiate his new employment agreement, negotiations failed to result in a new agreement, largely due to the Chair of the Compensation Committee's refusal to grant Sperzel equity compensation on par with industry standards.  As a result, the 2014 Employment Agreement expired.

30.     Sperzel eventually agreed to sign a new employment agreement with Chembio, effective retroactively to March 13, 2017 (the "2017 Employment Agreement"), after the Chair of the Company Board, Davis, agreed to address stock-based compensation by hiring an executive compensation consultant to assess Sperzel's compensation package with Chembio. A true and accurate copy of the 2017 Employment Agreement is attached hereto at **Exhibit I**.

31.     On March 15, 2017, in connection with the Company achieving a certain milestone, Sperzel was granted an option to purchase up to 5,000 incentive stock options of the Company's common stock, pursuant to the terms of a stock option agreement for (the "5,000 ISO Agreement").  Additionally, as set forth in the 2017 Employment Agreement, in recognition of Sperzel's importance and value to the Company and as an additional inducement for him to

enter into the agreement, on March 31, 2017, Sperzel was granted an option to purchase up to an additional 20,000 shares of the Company's common stock, set forth in two agreements:

    a.    A stock option agreement for 18,633 incentive stock options (the "18,633 ISO Agreement"); and

    b.    A stock option agreement for 1,367 non-incentive stock options (the "1,367 NISO Agreement").

A true and accurate copy of the 5,000 ISO Agreement, 18,633 ISO Agreement and 1,367 NISO Agreement is attached hereto at **Exhibits J**, **K**, and **L** respectively.  The three stock option agreements representing the 25,000 options granted to Sperzel in 2017 are hereinafter referred to as the "2017 Stock Option Agreements").

32.    Each one of the 2017 Stock Option Agreements states that the options granted thereunder are issued pursuant to the Company's 2014 Stock Incentive Plan (the "2014 Plan"). A true and accurate copy of the 2014 Plan is attached hereto at **Exhibit M**.

33.    Like the 2008 Plan, the 2014 Plan also defines an "Eligible Person" as "Officers and Employees and other persons **who provide services to the Company** or any Related Company, including directors of the Company or any Related Company" (emphasis added).

34.    As a result of the compensation consultant's assessment, which confirmed that Sperzel's compensation package was grossly below industry standards, Chembio also granted Sperzel a separate grant of 375,000 restricted shares of the Company's common stock as "catch-up compensation." As a show of his long-term commitment to the Company and its shareholders, Sperzel suggested a prolonged vesting schedule occurring at the end of four years, rather than the standard vesting schedule of 25% per year over four years, and the Board accepted his proposal.

35.    The 2017 Employment Agreement was effective for a three-year term expiring on March 13, 2020 (the "Term").  The 2017 Employment Agreement entitled Sperzel to the following severance benefits if his employment with Chembio was terminated without "Cause"

or if he resigned for "Reasonable Basis" (each as defined in the 2017 Employment Agreement), in exchange for signing a release of claims: (i) severance pay equal to his annual base-salary, paid on a monthly basis over 12 months; (ii) a pro-rated performance bonus; (iii) continued payment of the Company's share of his health insurance premium costs for a period of 12 months; and (iv) accelerated and full vesting of any outstanding equity awards.

36.     Notably, the 2017 Employment Agreement provided that Sperzel would be considered to have been terminated by Chembio without "Cause" if the Company and Sperzel did not enter into a new employment agreement by March 13, 2020, thereby entitling him to the full severance benefits set forth in the agreement.

**III.   Sperzel Leaves Chembio After The Company Fails To Renew His Contract**

37.     Chembio thrived under Sperzel's leadership.  During his nearly six-year tenure as President and CEO, Mr. Sperzel is largely credited with advancing and unlocking the value of the Company's patented DPP® technology.  In 2017, Sperzel was recognized as "Innovator of the Year" by a firm covering the Long Island, NY innovation economy. Prior to his arrival at the Company, Chembio's DPP® technology was limited to HIV and syphilis tests for Brazil and Mexico.  Sperzel expanded Chembio's technology broadly in infectious diseases by entering into collaborations with world-renowned organizations (e.g., The Bill and Melinda Gates Foundation, Paul G. Allen Family Foundation, FIND, and U.S. Government) that provided Chembio with millions of dollars in grants, and into new areas by entering into collaborations with world-leading pharmaceutical and other companies to develop novel DPP® tests to detect traumatic brain injury and eosinophilic respiratory disease, among others.

38.     The Company was ideally positioned to address the COVID-19 pandemic due to strategic actions taken under Mr. Sperzel's leadership, including: (i) expanding the Company's

DPP® technology to simultaneously and separately detect IgM and IgG antibodies; (ii) acquiring a German company to provide a hand-held instrument to interpret the DPP test results; (iii) entering into a strategic collaboration with LumiraDx to develop new infectious disease tests; (iv) building strong relationships with U.S. Government agencies (e.g., BARDA) that provided millions of dollars in product development funding; (v) entering into commercial distribution agreements with major U.S. distributors (i.e., Fisher, McKesson, Henry Schein); (vi) acquiring a Brazilian company focused on point-of-care tests for infectious diseases that expanded the Company's direct sales channels into Brazil; and (vii) signing a 10-year commercial agreement with the Brazilian Government.  Sperzel also spearheaded the expansion of the Company's facilities in New York, including investments in automated manufacturing equipment capable of producing in excess of 30 million diagnostic tests annually.

39.     Under Sperzel's leadership, the Company's valuation increased by one hundred and eight-three percent (183%), or nearly $60 million, from $32.6 million to $92.2 million.

40.     In November 2019, Sperzel became concerned that the 2017 Employment Agreement was near the end of its term and yet the Board or the Committee had not approached him to begin negotiations over a new employment agreement.  Hoping to avoid a repeat of 2017 when the Board allowed his employment agreement to expire, Sperzel reached out to Davis to initiate the negotiations over the continued terms of his employment at Chembio.

41.     Eventually, Gail S. Page, the Chair of the Committee, presented Sperzel with the terms of an offer.  The Company's offer was deficient in a number of material respects, offering a combination of annual base salary, bonus target and equity grants well below market, according to the compensation analysis completed by Pearl Meyer, a leading executive compensation consulting firm hired by the Committee.

42.     Sperzel presented the Board with a counter proposal, based on compensation data provided by the compensation consultant.  In response, Davis told Sperzel that she "gasped" when she saw his proposal, specifically referencing the equity proposal.  Ironically, Sperzel's equity proposal was consistent with the recommendations by the compensation consultant that was hired by the Committee, and with the 4-year equity plan he developed at the request of the Board, which the Board used to solicit shareholder approval to increase the Company's equity pool. Accordingly, Sperzel was not only surprised by Davis' reaction, but also perplexed that the Board refused to implement a plan that had been overwhelmingly approved by the shareholders.

43.     Sperzel was disappointed by the Company's reaction, although he was not entirely surprised.  Indeed, it was not the first time that the Board's actions disappointed him.

44.     For example, in May 2017, Sperzel was diagnosed with one of the world's rarest and deadliest disorders, Giant Cell Myocarditis.  After spending two months in a hospital intensive care unit, enduring countless surgeries, being put on life support, battling pneumonia and a life-threatening blood clot, Sperzel received a life-saving heart transplant.

45.     Despite his critical illness, Sperzel spoke with the members of his leadership team on a daily basis, and worked with members of the Board of Directors, while in the hospital and during the ensuing rehabilitation process that included battling several multi-drug resistant bacterial infections and sepsis.  To the surprise of Chembio's shareholders, Sperzel participated in the 2017 second quarter Earnings Report to Wall Street from his hospital bed. Nevertheless, while in the hospital fighting for his life and still fighting for the Company's success, Sperzel received an email from Davis, purporting to remove Sperzel permanently as CEO of the Company and relegate him to an advisor role, at a sixty percent (60%) pay cut.  When Sperzel challenged the Company to revoke its wrongful action, Chembio backed down.  Sperzel

recovered and officially returned to resume his full duties as President and CEO of Chembio on

October 3, 2017.  Davis later acknowledged the Board's attempts to remove Sperzel as CEO had

been "regrettable."

46.     Throughout 2019, Sperzel asked Page, Chair of the Compensation Committee, to

approve the proposed 2019 corporate incentive plan and targets for the Company, including the

executive leadership and CEO. While this is a primary responsibility of the Compensation

Committee, as described in the Committee Charter, Page and the Committee neglected to

approve the incentive plan or individual targets for the executive leadership team. In fact, in

November 2019, *eleven months into the calendar year,* Page finally sent Sperzel a 2019

incentive plan, including targets that were never discussed with him and would result in no

incentive payment for the entire leadership, including Sperzel. When Sperzel raised concerns

regarding the lack of Committee governance, Page and the Committee withdrew the new

incentive compensation plan altogether.

47.     In late November 2019, Neil Goldman, Chembio's Chief Financial Officer, sent a

letter to the Company's Board of Directors and counsel at K&L Gates raising concerns about the

lack of process and governance related to the incentive program, including the lack of alignment

with shareholders, the failure to implement an incentive plan that was developed with data from

the Company's compensation consultant (Pearl Meyer), and the Board's use of the same data to

obtain shareholder votes through the proxy process.

48.     In late December 2019, Sperzel received an offer of employment from another

company and notified Chembio about the offer.  Disillusioned by Chembio's apparent lack of

interest in retaining him as President and CEO, Sperzel told Chembio that he was prepared to

stay with the Company through the expiration of the 2017 Employment Agreement on March 13,

2020 (which would entitle him to the full severance benefits under the agreement, including accelerated vesting of any unvested equity award).  However, in the interest of the Company's shareholders, Sperzel indicated that he was amenable to negotiating an amicable separation from the Company before that date.

49.     Thereafter, Sperzel negotiated the terms of his separation with Board and Compensation Committee member John Potthoff.  The terms of Sperzel's separation from Chembio are set forth in a Separation and Release Agreement dated January 6, 2020 (the "Separation Agreement"). A true and accurate copy of the Separation Agreement is attached hereto at **Exhibit N**.

50.     In the Separation Agreement, the parties agreed that Sperzel's employment with Chembio would end on January 3, 2020 (the "Separation Date").

51.     As of the Separation Date, according to Chembio, the following equity rights of Sperzel in the Company remained unvested: 440,631 restricted shares of common stock and options to acquire up to 8,333 shares of common stock.

52.     Sperzel agreed to forego the 440,631 restricted shares of common stock and options to acquire 8,333 shares of common stock, all of which would have vested on March 13, 2020 had he stayed with the Company through that date, in exchange for the separation benefits set forth in the Separation Agreement.

53.     As of Sperzel's Separation Date, a total 266,666 shares of Chembio common stock were vested under his stock option agreements with the Company.

54.      A detailed summary of Sperzel's 266,666 options that were vested as of the Separation Date (collectively, the "Vested Options" and the stock option agreements underlying the Vested Options, the "Stock Option Agreements") is set forth below:

- 13 -

| Number of Options Granted | Grant Date | Exercise Price Per Share | Number of Options Vested at Separation | Exercise Price |
|---|---|---|---|---|
| 25,000 | 3/13/2014 | $3.4163 | 25,000 | $85,407.50 |
| 18,132 | 3/13/2014 | $3.4163 | 18,132 | $61,944.35 |
| 25,000 | 3/13/2014 | $3.4163 | 25,000 | $85,407.50 |
| 31,868 | 3/13/2014 | $3.4163 | 31,868 | $108,870.65 |
| 50,000 | 3/13/2014 | $3.4163 | 50,000 | $170,815.00 |
| 50,000 | 3/13/2014 | $3.4163 | 50,000 | $170,815.00 |
| 50,000 | 3/13/2014 | $3.4163 | 50,000 | $170,815.00 |
| 5,000 | 3/15/2017 | $5.25 | 3,333 | $17,498.25 |
| 18,633 | 3/31/2017 | $5.3666 | 12,422 | $66,663.91 |
| 1,367 | 3/31/2017 | $5.3666 | 911 | $4,888.97 |
| | | Total | 266,666 | $943,126.13 |

55. The Separation Agreement provides, in relevant part:  "**[e]xcept as otherwise expressly set forth in this Agreement**, Employee shall not represent himself after the Separation Date as being an employee, officer, director, agent or representative of the Company or any other member of the Company Group for any purpose" (emphasis added).

56. With respect to Sperzel's equity rights, paragraph 2(d) of the Separation Agreement provides as follows:

> (d) Equity, Equity Awards and Equity Plans. Employee may exercise any options granted under the Company's stock incentive plans that are vested and are exercisable as of the Separation Date **to the extent provided and in accordance with the provisions of such stock incentive plans**. Employee forfeited any unvested stock options and restricted stock outstanding as of the Separation Date. Employee is not be eligible for additional grants of stock options or restricted stock or any other equity awards following the Separation Date. Employee is not entitled to any accelerated vesting of equity awards in connection with his termination of service with the Company or any other member of the Company Group. Employee does not have any "put rights" with respect to any equity of the Company or any other member of the Company Group. Employee acknowledges that his equity awards ceased vesting following the Separation Date and the following portions of the following equity awards are vested and outstanding: 250,000 shares of the Company's common stock ("*Common Stock*") covered under the stock option granted by the Company on March 13, 2014; 3,333 shares of Common Stock covered under the stock option granted by the Company on March 15, 2017; 13,333 shares of Common Stock covered under the stock option granted by the Company on March 31, 2017; and 32,815 shares of Common Stock under a restricted stock award granted by the Company on October 8, 2018.

(emphasis added).

- 14 -

57.     Paragraph 2(e) of the Separation Agreement provides:

(e)  Trading Restrictions. Employee acknowledges and agrees that he (i) will not buy or sell any securities of the Company during the period from the Effective Date until the commencement of the second trading day on the NASDAQ Stock Market after the date on which the Company files its Annual Report on Form 10-K for the fiscal year ended December 31, 2019 with the Securities and Exchange Commission and (ii) will comply in all respects with applicable federal securities laws pertaining to "insider trading" with respect to securities of the Company.

58.     The members of the Company's Board of Directors were aware of Sperzel's standard practice of prohibiting Company executives, including himself, from exercising stock options during a trading "blackout" period, which Sperzel instituted and followed in order to avoid running afoul of federal securities laws pertaining to insider trading.

59.     The Board members were also well aware that Sperzel's departure would raise concerns with Wall Street analysts, Company shareholders, and business partners, given the instrumental role he played at Chembio.  In fact, the day after Chembio announced Sperzel's resignation, Chembio's stock traded as low as $3.89 per share, a 20% drop from the prior day's closing price.

60.     Accordingly, the Company insisted on including language in the Separation Agreement providing for Sperzel's continued involvement and provision of services with the Company after the end of his employment.  Thus, in Paragraph 10 of the Separation Agreement, Sperzel agreed to "make himself reasonably available **to consult** for transition matters for a period of ninety calendar days following the Separation Agreement" (emphasis added). Paragraph 10 also requires Sperzel to "make himself reasonably available to assist, give testimony and review discovery requests in connection with litigation or other disputes involving the Company." If the Company requests such services, the Separation Agreement entitles Sperzel

to be "compensated at the rate of $218.75 per hour *for such services, as* **an independent**

**contractor**" (emphasis added).

61.     Consistent with the Separation Agreement, the Form 8-K which Chembio filed in

connection with his departure states that Sperzel would "**consult** with [the Company] on

transition matters for ninety days" (emphasis added).

62.     According to the Merriam-Webster Dictionary, to "consult" means, in relevant

part, "to ask the advice or opinion of" and a "consultant" is defined as "one who gives

professional advice or services."

**IV.   At The Company's Request, Sperzel Continues To Perform Services For Chembio
       After He Leaves The Company**

63.     Consistent with the Separation Agreement, after the end of his employment in

January 2020, Sperzel continued to provide significant services to Chembio.  For example, he

consulted with a number of individuals at the Company, including members of the Board of

Directors, with the full knowledge and approval of the Board.  The services that Sperzel

provided, and continues to provide to Chembio, go well beyond the typical transitional assistance

that would be expected from a departing CEO.

64.     For example, Sperzel worked closely with the Company's counsel, Goldman and

Page (who by that time had been appointed as the Company's interim CEO) to coordinate the

filing of the Form 8-K announcing his departure.  After the filing, Sperzel notified Goldman that

he had received numerous calls and messages from Chembio shareholders and the news media

regarding his departure.  Page directed Sperzel to speak with these shareholders.

65.     Sperzel abided by Page's instructions.  Over the next 90 days after his

employment ended, Sperzel spoke with numerous Chembio shareholders to reassure them about

his departure and the Company's plans for moving forward.  Sperzel updated Davis, the Chair of the Company's Board, on his communications with shareholders.

66.     On January 17, 2020, in response to an email from Sperzel about the Company's CEO search, Davis asked him whether Sperzel had any thoughts or observations that he would like to share.  In response, Sperzel provided Davis with names and backgrounds of several CEO candidates, including Richard L. Eberly, who was ultimately hired as CEO. He also informed Davis of numerous shareholder interactions, and told Davis that shareholders had suggested that he stresses his involvement in assisting Chembio finding his successor.  Based on this, Sperzel suggested that he remain highly involved in communicating with shareholders while the Company searched for his replacement.  Davis did not respond to Sperzel's email.

67.     Consistent with his email to Davis on January 17, 2020, and prior direction from Page, Sperzel continued to speak with shareholders, and he consulted with the Company with respect to his potential replacement.  Sperzel recommended Eberly to Page as a potential CEO candidate.  With the Board's knowledge, Sperzel and Eberly had several communications about his potential employment with Chembio.  Chembio hired Eberly as its President and Chief Executive Officer, effective March 16, 2020.

68.     Sperzel also notified Goldman that BDO USA, Chembio's accounting firm, had asked to speak with him (Sperzel) about the reasons for his departure from the Company. Goldman instructed Sperzel to go ahead with the call, and Sperzel proceeded to have a conversation with Joseph Scheriff, Assurance Partner at BDO, as he had been instructed.

69.      Sperzel consulted with several members of the Company's executive team, including Page and Goldman, related to a funding opportunity through a U.S. government entity, a relationship that was successfully built under Sperzel's leadership.  In an email to Page on

March 12, 2020, Sperzel also advised her on how to best communicate the Company's point-of-care platform with respect to its COVID-19 antibody test initiative so as to best position it to address the current pandemic. Page responded, "Thanks!!"

70.      On March 30, 2020, Sperzel responded to questions from a Wall Street analyst regarding COVID-19 antibody testing efforts. In his detailed response to the analyst, Sperzel noted his belief that Chembio was "very well positioned" to succeed regarding point-of-care COVID-19 antibody testing and highlighted some of the Company's key capabilities, including: (i) a patented DPP technology platform able to discreetly detect IgM and IgG antibodies from a tiny drop of fingertip blood; (ii) a patented low-cost instrument capable of capturing, storing, and transmitting test results; (iii) a successful track record of quickly developing antibody tests in response to prior outbreaks (e.g., Ebola, Zika) and obtaining regulatory approvals; (iv) a successful track record obtaining funding from multiple Government agencies (e.g., BARDA, CDC, NIH); and (v) automated manufacturing lines in the United States, capable of producing tens of millions of tests annually, supported by tax incentives from the state of New York.

71.      Sperzel shared his comprehensive reply with the Company's Board and the executive leadership team, including Goldman and the new CEO, Eberly. In his email to the Chembio team, Sperzel advised that he was "not sure people understand the real differences in the tests (venous vs fingerstick, molecular vs antibody, laboratory vs point-of-care, etc.) I'm sure the CEMI [i.e., Chembio] team can help people to connect the dots." John G. Potthoff, Ph.D., Chembio Board member responded, "Thank you John!"

72.      In early April, 2020, Sperzel received an inquiry from Chembio's distributor located in Puerto Rico. The Vice President at the distributor requested Sperzel's assistance in connection with a desire to purchase two million (2,000,000) of Chembio's COVID-19 point-of-

care antibody tests.  Sperzel promptly reached out to the Company, to connect the distributor

with the new CEO and Page, and made positive remarks about Chembio's capabilities. Page

thanked Sperzel for his email.

73.     In early April, 2020, Sperzel contacted Eberly and Page about an inquiry he had

received from a potential customer (a global biopharmaceutical company) about a COVID-19

antibody test to use for a convalescent plasma program to treat patients, and asking whether they

would like Sperzel to make an introduction.  When he did not hear back from either individual,

Sperzel followed up with another email a few days later, letting Eberly and Page know that he

had provided their contact information to the potential partner. This time, Eberly responded to

Sperzel's email by asking him to direct the business contact to him, Eberly, which Sperzel did.

74.     In early January 2020, the Company asked Sperzel to be available September 22-

25, 2020 for an evidentiary hearing in connection with a pending arbitration. The Company

(through its counsel) has described Sperzel's attendance at that hearing as "critical."  Sperzel

agreed to make himself available and booked four (4) vacation days from his current employer.

75.     In September 2020, as the evidentiary hearing neared and having not heard from

Chembio or its counsel otherwise, Sperzel assumed that the hearing was moving forward as

scheduled.  He prepared for the hearing and made himself available for the hearing by using

vacation days from his current employer.  However, Sperzel was later informed – on a day that

had previously been scheduled as a hearing date – that the evidentiary hearing had in fact been

rescheduled to April, 2021.

76.     In November 2020, at Chembio's request and in collaboration with the

Company's outside counsel, Sperzel prepared a witness statement in connection with the pending

arbitration.  The Company also asked Sperzel to participate in the evidentiary hearing, which is currently scheduled for April 19-22, 2021. Sperzel agreed to make himself available.

77.     Sperzel, via counsel, submitted two invoices to Chembio, each requiring payment within 30 days from the date of the invoice, for the services he provided in September 2020 and November 2020 in connection with the arbitration.  Despite the clear language in the Separation Agreement, which requires Chembio to compensate Sperzel "at the rate of $218.75 per hour for such services," Chembio has failed to pay Sperzel the amounts owed under the invoices. Chembio has had no conversations with Sperzel about the unpaid invoices.

## V.   The Company Unlawfully Refuses To Allow Sperzel To Exercise his Vested Options

78.     When Sperzel's employment ended, he received no information from the Company regarding the process or timing for exercising his Vested Options, other than the information set forth in the Separation Agreement.

79.     On March 12, 2020, Sperzel emailed Goldman, with a copy to Mark L. Johnson, the Company's outside corporate counsel with the international law firm of K&L Gates LLP, inquiring about the timing and process for exercising his Vested Options.  Sperzel indicated his understanding that he was restricted from exercising his options until the Company reported its earnings.  Goldman responded to Sperzel's email and confirmed Sperzel's understanding, indicating that "[w]ithout digging into your separation agreement, I suspect the same rules continue to apply as when you were employed, which would mean restrictions continue until Monday," i.e., March 16, 2020.  Goldman also asked Sperzel whether he planned on exercising with cash or to do a cashless exercise.  Sperzel responded to Goldman's email a few minutes later, confirming his preference for a cashless exercise, requesting the documents for him to exercise his options, and requesting Johnson to confirm the timing for exercise.

- 20 -

80.    On March 12, 2020, Johnson replied to Sperzel's email, with a copy to Goldman, writing that the window for Sperzel to be able to exercise his Vested Options "opens at the commencement of trading on the second trading day after the 10-K is filed" so Sperzel should defer trading until Tuesday, March 17, 2020.

81.    On March 12, 2020, Goldman forwarded this email exchange to another K&L Gates attorney who represents the Company, directing him to send all applicable forms to Sperzel.

82.    On March 20, 2020, as part of the same email chain, Sperzel replied to Goldman's email and asked Goldman to remind the K&L Gates attorney to send him that day the necessary documents to exercise his options on a cashless basis, "in the event I decide to do so."  The attorney replied to Sperzel's email soon after, by sending him the option exercise forms.

83.    On March 30, 2020, Sperzel emailed Goldman again, asking Goldman to reach out to Johnson, this time to confirm the deadline for exercising the Vested Options.  Having not heard back from Goldman, Sperzel sent his inquiry to Board member Potthoff, who indicated that he had passed on Sperzel's inquiry to Attorney Johnson.

84.    On April 1, 2020, Johnson emailed Sperzel that his Vested Options would seem to be exercisable as follows: (i) the 250,000 shares that were granted under the 2008 Plan had an exercise period of up to three months, and such period would expire on April 9, 2020; and (ii) the 13,333 shares granted under the 2014 Plan had a post-termination exercise period of up to ninety days, set to expire on April 8, 2020.  However, Johnson noted that the stock agreements underlying the options could provide for a different exercise period, but that it would be unusual to have a shorter exercise period.  On April 1, 2020, Sperzel responded to Johnson's email, indicating that he was prohibited from trading due to his possession of material non-public

information ("MNPI") until Chembio reported its Q4 and FY 2019 results (which it did mid-March, 2020).

85.     On April 3, 2020, Johnson notified Sperzel, for the first time and contrary to the 2008 and 2014 Plans, that his Vested Options were exercisable for only 30 days after the end of his employment, and therefore, all his options expired on February 2, 2020.  Contrary to his prior representations to Sperzel, Attorney Johnson (on Chembio's behalf) now took the position that Sperzel's possession of MNPI after he left Chembio was irrelevant for purposes of exercising the Vested Options and did not toll the exercise period for the options.  Despite Sperzel's prior communications expressing a clear preference for a cashless exercise, Johnson now claimed that Sperzel could have exercised the Vested Options without violating insider trading securities laws by paying the exercise price in cash, i.e., $943,126.13.  Johnson then stated bluntly "Given that the option agreements expired, there unfortunately is no way to resuscitate them."

86.     On April 6, 2020, Sperzel responded to Johnson's email of April 3, 2020.  In his email, Sperzel raised a number of points, including his continued qualification as an "Eligible Person" under the applicable plans in light of the continued services he provided (and continued to provide) to Chembio.  He requested Johnson to confirm that the Vested Options remain exercisable.  During a follow up telephone call with Sperzel on April 9, 2020, Johnson told him that the Company did not consider his services post-separation to have been important or significant enough to qualify him as an "Eligible Person" under the plans.  Johnson also indicated that he would try to arrange a Committee meeting to review the matter.

87.     Growing increasingly concerned that Chembio and its Board would deprive him of his Vested Options unreasonably and in bad faith, Sperzel retained counsel.

- 22 -

88.     By letter dated April 17, 2020, Sperzel, through his attorney, notified Davis of his intent to exercise his vested options consistent with and pursuant to his Stock Option Agreements and the 2008 and 2014 Plans and made certain requests.  The Company did not respond to the April 17, 2020 letter.

89.     By letter dated April 22, 2020, Sperzel, through his counsel, made demand on Chembio to exercise all vested options under the Options Agreements, for a total of 266,666 shares of Chembio common stock.  Sperzel tendered $943,126.13 by offering to wire it immediately to Chembio in exchange for the 266,666 shares of common stock representing the Vested Options.  A true and accurate copy of Sperzel's exercise notice is attached hereto at **Exhibit O**.

90.     By letter from its newly retained outside counsel, dated May 5, 2020, Chembio refused to tender the 266,666 shares that Sperzel sought to exercise pursuant to the Options Agreements.  Among other arguments, Chembio (through its counsel) stated that the Committee had determined that the Vested Options expired on February 3, 2020 and that Sperzel's continued services to the Company after his separation were insufficient to make him an Eligible Person – in fact, the Company now claimed that he provided "no 'services'" at all after he left Chembio.

91.     As a result of the Company's failure to tender the Chembio stock to which Sperzel was entitled under the Stock Options Agreements, Sperzel suffered significant damages.

92.     On April 22, 2020, the date Sperzel sought to exercise his options, the Chembio stock closed at $14.31 per share.  The following day, when Sperzel would have been able to sell the 266,666 Vested Options, the Chembio stock traded between $15.11 and $15.89 per share, with an average of $15.50 per share.

93.     On May 11, 2020, the Company announced the closing of a public offering of 2,619,593 shares of its common stock, raising approximately $30.8 million.

94.     On information and belief, the Company and its Board treated Sperzel differently with respect to his stock options than they treated other departing directors.

## VI. CAUSES OF ACTION

### Count I
### Breach of Contract Re: Separation Agreement

95.     Sperzel repeats the allegations above as if set forth herein.

96.     Sperzel and the Company entered into the Separation Agreement.  The Separation Agreement is a valid, binding and enforceable agreement between Sperzel and Chembio.

97.     The Separation Agreement provides that Sperzel can exercise "any options granted under the Company's stock incentive plans that are vested and are exercisable as of the Separation Date to the extent provided and in accordance with the provisions of such stock incentive plans."

98.     The Stock Option Agreements underlying the Vested Options provide that any option vested thereunder may be exercised for 30 days after Sperzel ceases to be an "Eligible Person," except in the case of certain circumstances, which are not applicable here.

99.     The 2008 and 2014 Stock Plans both define an "Eligible Person" as including any person "who provide[s] services to the Company."

100.     The Separation Agreement required Sperzel to consult with Chembio for at least 90 days after the end of his employment with the Company and to assist the Company in litigation matters at any time after he left Chembio.

101.     Consistent with the Separation Agreement, Sperzel provided significant services to the Company after his employment ended, with the full knowledge and approval of Chembio.

Among other services, Sperzel assisted Chembio in identifying and hiring his replacement; spoke with important Chembio shareholders; facilitated communications between the Company and important vendors; and strategized with the Company to best position it to develop and market a point-of-care COVID-19 antibody test.  In the fall of 2020, Sperzel also assisted the Company with an arbitration matter, as an independent contractor, and continues to provide such services at the request of the Company.

102.     The services which Sperzel provided to Chembio went beyond merely assisting the Company with transitional matters.

103.     After the Separation Date, at the request of Chembio, Sperzel has continued to "provide services to the Company" and remains an "Eligible Person" consistent with and pursuant to the 2008 and 2014 Stock Plans.

104.     Sperzel's right to exercise the Vested Options consistent with the 2008 and 2014 Stock Plans was a material term of the Separation Agreement.

105.     The Company's refusal (through its Compensation Committee) to allow Sperzel to exercise the Vested Options constitutes a material breach of the Separation Agreement, which has caused Sperzel to sustain significant damages in an amount to be proven at trial.

**Count II**
**Breach of Contract Re: 25,000 ISO Agreement**

106.     Sperzel repeats the allegations above as if set forth herein.

107.     Sperzel and the Company entered into the 25,000 ISO Agreement.  The 25,000 ISO Agreement is an enforceable agreement, governed by the 2008 Plan.

108.     The option to purchase 25,000 shares of common stock pursuant to the terms of the 25,000 ISO Agreement and the 2008 Plan is fully vested.

109.     By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2008 Plan and the 25,000 ISO Agreement.

110.     Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 25,000 shares of Chembio common stock pursuant to and consistent with the 25,000 ISO Agreement and 2008 Plan.  Chembio has no legal excuse for its failure to abide by the terms of the 25,000 ISO Agreement.  Sperzel, on the other hand, completely performed his obligations under the terms of the 25,000 ISO Agreement and the Separation Agreement.

111.     Chembio's breach of the 25,000 ISO Agreement caused Sperzel damages of at least $302,093 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

**Count III**
**Breach of Contract Re: 18,132 ISO Agreement**

112.     Sperzel repeats the allegations above as if set forth herein.

113.     Sperzel and the Company entered into the 18,132 ISO Agreement.  The 18,132 ISO Agreement is an enforceable agreement, governed by the 2008 Plan.

114.     The option to purchase 18,132 shares of common stock pursuant to the terms of the 18,132 ISO Agreement and the 2008 Plan is fully vested.

115.     By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2008 Plan and the 18,132 ISO Agreement.

116.     Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 18,132 shares of Chembio common stock pursuant to and consistent with the 18,132 ISO Agreement and 2008 Plan.  Chembio has no legal excuse for its failure to abide by the terms

of the 18,132 ISO Agreement. Sperzel, on the other hand, completely performed his obligations under the terms of the 18,132 ISO Agreement and the Separation Agreement.

117.    Chembio's breach of the 18,132 ISO Agreement caused Sperzel damages of at least $219,102 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

**Count IV**
**Breach of Contract Re: 25,000 NISO Agreement**

118.    Sperzel repeats the allegations above as if set forth herein.

119.    Sperzel and the Company entered into the 25,000 NISO Agreement. The 25,000 NISO Agreement is an enforceable agreement, governed by the 2008 Plan.

120.    The option to purchase 25,000 shares of common stock pursuant to the terms of the 25,000 NISO Agreement and the 2008 Plan is fully vested.

121.    By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2008 Plan and the 25,000 NISO Agreement.

122.    Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 25,000 shares of Chembio common stock pursuant to and consistent with the 25,000 NISO Agreement and 2008 Plan. Chembio has no legal excuse for its failure to abide by the terms of the 25,000 NISO Agreement. Sperzel, on the other hand, completely performed his obligations under the terms of the 25,000 NISO Agreement and the Separation Agreement.

123.    Chembio's breach of the 25,000 NISO Agreement caused Sperzel damages of at least $302,093 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

**Count V**
**Breach of Contract Re: 31,868 NISO Agreement**

124.    Sperzel repeats the allegations above as if set forth herein.

125.    Sperzel and the Company entered into the 31,868 NISO Agreement.  The 31,868 NISO Agreement is an enforceable agreement, governed by the 2008 Plan.

126.    The option to purchase 31,868 shares of common stock pursuant to the terms of the 31,868 NISO Agreement and the 2008 Plan is fully vested.

127.    By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2008 Plan and the 31,868 NISO Agreement.

128.    Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 31,868 shares of Chembio common stock pursuant to and consistent with the 31,868 NISO Agreement and 2008 Plan.  Chembio has no legal excuse for its failure to abide by the terms of the 31,868 NISO Agreement.  Sperzel, on the other hand, completely performed his obligations under the terms of the 31,868 NISO Agreement and the Separation Agreement.

129.    Chembio's breach of the 31,868 NISO Agreement caused Sperzel damages of at least $385,083 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

**Count VI**
**Breach of Contract Re: 2017 NISO Agreement**

130.    Sperzel repeats the allegations above as if set forth herein.

131.    Sperzel and the Company entered into the 2017 NISO Agreement.  The 2017 NISO Agreement is an enforceable agreement, governed by the 2008 Plan.

132.    The option to purchase 50,000 shares of common stock pursuant to the terms of the 2017 NISO Agreement and the 2008 Plan is fully vested.

133.    By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2008 Plan and the 2017 NISO Agreement.

134.    Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 50,000 shares of Chembio common stock pursuant to and consistent with the 2017 NISO Agreement and 2008 Plan.  Chembio has no legal excuse for its failure to abide by the terms of the 2017 NISO Agreement.  Sperzel, on the other hand, completely performed his obligations under the terms of the 2017 NISO Agreement and the Separation Agreement.

135.    Chembio's breach of the 2017 NISO Agreement caused Sperzel damages of at least $604,185 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

**Count VII**
**Breach of Contract Re: 2018 NISO Agreement**

136.    Sperzel repeats the allegations above as if set forth herein.

137.    Sperzel and the Company entered into the 2018 NISO Agreement.  The 2018 NISO Agreement is an enforceable agreement, governed by the 2008 Plan.

138.    The option to purchase 50,000 shares of common stock pursuant to the terms of the 2018 NISO Agreement and the 2008 Plan is fully vested.

139.    By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2008 Plan and the 2018 NISO Agreement.

140.     Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 50,000 shares of Chembio common stock pursuant to and consistent with the 2018 NISO Agreement and 2008 Plan.  Chembio has no legal excuse for its failure to abide by the terms of the 2018 NISO Agreement.  Sperzel, on the other hand, completely performed his obligations under the terms of the 2018 NISO Agreement and the Separation Agreement.

141.     Chembio's breach of the 2018 NISO Agreement caused Sperzel damages of at least $604,185 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

### Count VIII
### Breach of Contract Re: 2019 NISO Agreement

142.     Sperzel repeats the allegations above as if set forth herein.

143.     Sperzel and the Company entered into the 2019 NISO Agreement.  The 2019 NISO Agreement is an enforceable agreement, governed by the 2008 Plan.

144.     The option to purchase 50,000 shares of common stock pursuant to the terms of the 2019 NISO Agreement and the 2008 Plan is fully vested.

145.     By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2008 Plan and the 2019 NISO Agreement.

146.     Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 50,000 shares of Chembio common stock pursuant to and consistent with the 2019 NISO Agreement and 2008 Plan.  Chembio has no legal excuse for its failure to abide by the terms of the 2019 NISO Agreement.  Sperzel, on the other hand, completely performed his obligations under the terms of the 2019 NISO Agreement and the Separation Agreement.

147.    Chembio's breach of the 2019 NISO Agreement caused Sperzel damages of at least $604,185 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

**Count IX**
**Breach of Contract Re: 5,000 ISO Agreement**

148.    Sperzel repeats the allegations above as if set forth herein.

149.    Sperzel and the Company entered into the 5,000 ISO Agreement.  The 5,000 ISO Agreement is an enforceable agreement, governed by the 2014 Plan.

150.    The option to purchase shares of common stock pursuant to the terms of the 5,000 ISO Agreement and the 2014 Plan was vested as to 3,333 shares as of the Separation Agreement.

151.    By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2014 Plan and the 5,000 2017 ISO Agreement.

152.    Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 3,333 shares of Chembio common stock pursuant to and consistent with the 5,000 ISO Agreement and 2014 Plan.  Chembio has no legal excuse for its failure to abide by the terms of the 2019 NISO Agreement.  Sperzel, on the other hand, completely performed his obligations under the terms of the 5,000 ISO Agreement and the Separation Agreement.

153.    Chembio's breach of the 5,000 ISO Agreement caused Sperzel damages of at least $34,163 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

**Count X**
**Breach of Contract Re: 18,633 ISO Agreement**

154.    Sperzel repeats the allegations above as if set forth herein.

155.    Sperzel and the Company entered into the 18,633 ISO Agreement.  The 18,633 ISO Agreement is an enforceable agreement, governed by the 2014 Plan.

156.    The option to purchase shares of common stock pursuant to the terms of the 18,633 ISO Agreement and the 2014 Plan was vested as to 12,422 shares as of the Separation Agreement.

157.    By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2014 Plan and the 18,633 ISO Agreement.

158.    Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 12,422 shares of Chembio common stock pursuant to and consistent with the 18,633 ISO Agreement and 2014 Plan.  Chembio has no legal excuse for its failure to abide by the terms of the 18,633 ISO Agreement.  Sperzel, on the other hand, completely performed his obligations under the terms of the 18,633 ISO Agreement and the Separation Agreement.

159.    Chembio's breach of the 18,633 ISO Agreement caused Sperzel damages of at least $125,877 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

**Count XI**
**Breach of Contract Re: 1,367 NISO Agreement**

160.    Sperzel repeats the allegations above as if set forth herein.

161.    Sperzel and the Company entered into the 1,367 NISO Agreement.  The 1,367 NISO Agreement is an enforceable agreement, governed by the 2014 Plan.

162.    The option to purchase shares of common stock pursuant to the terms of the 1,367 NISO Agreement and the 2014 Plan was vested as to 911 shares as of the Separation Agreement.

163.    By virtue of the services he continued to provide to Company after his employment with Chembio ended, Sperzel continued to qualify as an "Eligible Person" under the terms of the 2014 Plan and the 1,367 NISO Agreement.

164.    Chembio breached its agreement with Sperzel when it refused to allow him to exercise the 911 shares of Chembio common stock pursuant to and consistent with the 1,367 NISO Agreement and 2014 Plan.  Chembio has no legal excuse for its failure to abide by the terms of the 1,367 NISO Agreement.  Sperzel, on the other hand, completely performed his obligations under the terms of the 1,367 NISO Agreement and the Separation Agreement.

165.    Chembio's breach of the 1,367 NISO Agreement caused Sperzel damages of at least $9,232 by depriving him of an asset that he has contractually earned and to which he is rightly entitled.

**Count XII**
**Breach of Contract Re: Separation Agreement**

166.    Sperzel repeats the allegations above as if set forth herein.

167.    The Separation Agreement required Sperzel to consult with Chembio for at least 90 days after the end of his employment with the Company.

168.    The Separation Agreement also required Sperzel to make himself available at the Company's request to assist Chembio in connection with litigation matters, including, without limitation, giving testimony and reviewing document requests.  Consistent with the Separation Agreement, Sperzel reviewed documents in anticipation of the evidentiary hearing in September (which was postponed to April 2021), cleared his calendar in anticipation of his participation in said hearing, and collaborated with Chembio's outside counsel to prepare a witness statement.

169.    The Company breached the Separation Agreement by failing to pay Sperzel the consulting fee to which he is entitled in exchange for providing his services.

170.     The Company's refusal (through its Compensation Committee) to allow Sperzel to exercise the Vested Options constitutes a material breach of the Separation Agreement, which has caused Sperzel to sustain damages in an amount to be proven at trial.

### Count XIII
### Breach of Implied Covenant of Good Faith and Fair Dealing

171.     Sperzel repeats the allegations above as if set forth herein.

172.     Each of the Stock Option Agreements and Stock Plans are governed by the law of Nevada.

173.     A covenant of good faith and fair dealing is implied into every contract in the State of Nevada.

174.     The covenant requires the parties to remain faithful to their intended and agreed upon expectations concerning contractual performance and prohibits one party from injuring the other's right to reap the benefits prescribed by the terms of the contract.

175.     The Stock Option Agreements are valid contracts between Chembio and Sperzel and thus a covenant of good faith and fair dealing is implied in each one of the ten contracts.

176.     Chembio (through its Board and agents) acted arbitrarily, unreasonably, and not in accordance with its expected contractual performance, in preventing Sperzel from reaping the benefits of the Stock Options Agreements and the Separation Agreement.

177.     As a result, Sperzel suffered substantial damages in excess of $3 million.

### Count XIV
### Quantum Meruit

178.     Sperzel repeats the allegations above as if set forth herein.

179.     In his role as President and Chief Executive Officer, Sperzel provided important services to Chembio, both during and after the end of his employment, including, without

limitation: (i) leading the Company's operations and growing Chembio's value to nearly $100 million dollars; (ii) communicating with Company executives, shareholders and Wall Street analysts to reassure them about his departure from the Company; (iii) assisting Chembio to identify and hire his replacement; (iv) communicating with important parties who reached out to him for assistance when their attempts to communicate with Company executives failed; and (v) making strategic recommendations to Board members and executives for best positioning the Company's point-of-care technology to address the current emerging COVID-19 pandemic.

180.    Sperzel provided his services to Chembio with the full knowledge and approval of the Company, including its Board members and top executives.

181.    Chembio knew that the Vested Options formed an important part of Sperzel's compensation in his role as President and Chief Executive Officer of Chembio.  Equity compensation forms the cornerstone of the compensation package for Chief Executive Officers, and Sperzel expressly negotiated his equity grants both as part of his employment agreements and his separation agreement with Chembio.

182.    Despite knowing the importance of the Vested Options to him, when Sperzel left Chembio, the Company took no steps to inform him of the alleged pending expiration of the Vested Options.  To the contrary, Chembio's agents reinforced his understanding that he was restricted from exercising his options when he left the Company.

183.    Under the circumstances outlined above, including the conduct of Chembio's agents and the clear definition of an "Eligible Person" under the operative plan documents, it is reasonable for Sperzel to expect payment in exchange for the services he provided Chembio.

184.    As a direct and proximate result of the unjustifiable failure or refusal of the Company to allow Sperzel to exercise the Vested Options, Chembio has been unjustly enriched in an amount to be determined by this court after a trial of the merits.

**Count XV**
**Declaratory Judgment That Sperzel Is Relieved From**
**Further Performance Under the Separation Agreement**

185.    Sperzel repeats the allegations above as if set forth herein.

186.    Sperzel's right to exercise the Vested Options consistent with the 2008 and 2014 Stock Plans was a material term of the Separation Agreement. Chembio has materially breached the terms of the Separation Agreement by refusing to allow Sperzel to exercise the Vested Options.

187.    Chembio has also materially breached the Separation Agreement by refusing to pay Sperzel the fees he earned for the services he provided to the Company in connection with an arbitration matter.

188.    Chembio's material breaches of the Separation Agreement relieve Sperzel's obligation to further perform thereunder including, without limitation, the obligations in Paragraph 10 thereof.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff John J. Sperzel III prays for judgment as follows:

1. Compensatory damages as a result of the wrongs alleged in this Complaint;

2. A declaration that Sperzel is relieved from any further performance under the Separation Agreement between him and Chembio;

3. An award of his costs and expenses in this litigation, including reasonable attorneys' fees, expert costs and other costs and disbursements; and

4.  Any other and further relief as the Court may deem just and proper.

## VIII.   <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


*/s/ Brian A. Katz*

_____

Brian A. Katz
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, NY 10019
Tel: 212.451.2276
Fax: 212.451.2222
BKatz@olshanlaw.com


Christopher P. Maffucci (pro hac vice pending)
Stephanie Smith (pro hac vice pending)
CASNER & EDWARDS LLP
303 Congress Street
Boston, MA  02210
Tel: 617-426-5900
Fax: 617-426-8810
maffucci@casneredwards.com
smith@casneredwards.com

*Attorneys for Plaintiff John J. Sperzel III*

Dated: March 19, 2021